**James D. SALVINI, et al.,**

v.

**FLUSHING SUPPLIES CORP., et al.**

**Civ. A. No. 89–30247–F.**

United States District Court, D. Massachusetts.

June 24, 1991.

Michael P. Ziter, Peter A. Velis, Velis and Ziter, Westfield, Mass., for plaintiffs.

John B. Stewart, Moriaty, Donoghue & Leja, Springfield, Mass., for defendants.

## MEMORANDUM AND ORDER REGARDING MOTION FOR ORDER ESTABLISHING ATTORNEY'S LIEN [1]

MICHAEL A. PONSOR, United States Magistrate Judge.

### I. INTRODUCTION.

On September 15, 1989 the plaintiff, James D. Salvini, suffered devastating brain injuries as a result of a collision with a tractor trailer. He and his family were represented for some time by Attorney Martin O'Connell of the law firm Morisi & O'Connell.

In July of 1990 the plaintiffs discharged Attorney O'Connell and hired Michael P. Ziter and Peter A. Velis of the law firm Velis and Ziter. Pretrial proceedings in the case were completed and on April 1, 1991 trial commenced with Attorney Velis acting as trial counsel. On April 5, 1991, following closing arguments but before the

court's instructions, the case settled for $2 million.[2]

Before the court now is the motion pursuant to Mass.Gen.Laws ch. 221, § 50 to enforce the attorney's lien of Morisi & O'Connell. *See, Gil–Wal Corp. v. Painewebber, Inc.,* 734 F.Supp. 566 (D.Mass.1990); *In Re: Hoy's Claim,* 93 F.Supp. 265 (D.Mass.1950). For the reasons set forth below, the court finds that Morisi & O'Connell are entitled to a modest share of the fee generated by this case to compensate them, on a theory of *quantum meruit,* for the reasonable value of the services rendered by them in the initial stage of the case.

### II. FACTUAL FINDINGS.

Both counsel agree that an evidentiary proceeding is not necessary to permit the court to make appropriate findings to anchor its ruling on the pending motion. The court agrees and makes the following findings.

1. Attorney Martin O'Connell was a family acquaintance of the plaintiffs here. On September 17, 1989, two days following the accident that had put James D. Salvini in an extended coma, Attorney O'Connell appeared at the hospital and, after some discussion, entered into an oral retainer agreement with the parents and sister of the victim. This agreement was later reduced to writing in two separate fee agreements calling for payment of a one-third contingent fee.

2. Following his retention, Attorney O'Connell hired an investigator who took a statement from the driver of the defendant's tractor trailer. While useful, the statement did not have significant impact on either the trial or settlement of this case, since several other more helpful statements previously given by the driver

---

1. The parties to this action have waived their right to proceed before a judge in the United States District Court and consented to have this magistrate conduct any and all further proceedings in the case, including the trial, and order the entry of judgment. Fed.R.Civ.P. 73, 28 U.S.C. § 636(c).

2. $1.3 million of this award has been released. $300,000 is being held in an interest-bearing account by the clerk pending a ruling on the amount of the lien.

to law enforcement authorities were placed in evidence at trial. The statement obtained by the investigator was never offered.

3. Attorney O'Connell also hired an accident reconstruction expert. This expert visited the accident scene, examined the tractor trailer and motor vehicle, and prepared a report. Again, the prompt retention of the accident reconstruction expert, while useful, was not crucial. It required little experience to recognize the importance of this step. More importantly, it was Velis and Ziter who subsequently worked most closely with this expert in preparing the case, deposing defendants' expert and shaping the expert's testimony for trial.

4. In addition to retaining the investigator and accident reconstruction expert, Attorney O'Connell filed the complaint, conducted one deposition, retained a doctor, engaged in some paper discovery and assembled medical reports and other documents.

5. As various insurance payments came in for Personal Injury Protection, medical payments and property damage Attorney O'Connell instructed the Salvinis to endorse the checks for deposit into his firm's account to cover expenses for prosecution of the litigation.

6. In addition to representing the plaintiffs in the civil action, Attorney O'Connell assisted plaintiffs preliminarily in the criminal charges pending against James D. Salvini as a result of the accident, and performed legal services in the Probate Court to obtain appointment of a temporary conservator. Fees totaling something under $2,000 were tendered to the plaintiffs and deducted from the funds deposited by the Salvinis in the Morisi & O'Connell trust account. The firm was fully paid for its work in the criminal and probate proceedings.

7. In the latter part of 1989 and, increasingly, in 1990 the plaintiffs became dissatisfied with the services provided by Attorney O'Connell. The Salvinis were unhappy with the delay in resolving the criminal charge and were unimpressed with the skill and diligence shown by Attorney O'Connell in prosecuting the civil case. It is not necessary for the court to find that this perception was accurate, but it is beyond any doubt that the feelings on the part of the Salvinis were strong and sincere.

8. In July of 1990 the plaintiffs decided to change to the Velis and Ziter firm. Attorneys Morisi and O'Connell each had six to seven years experience as members of the bar at the time they were retained by the Salvinis; Attorneys Velis and Ziter each had in excess of twenty years experience in July of 1990.

9. On July 12, 1990 the Salvinis notified Attorney O'Connell in writing that they were discharging him. Nevertheless, Attorney O'Connell at first declined to surrender the file. Further letters were sent on July 19 and August 1. The file was eventually produced in late August 1990.

10. *Following* his termination Attorney O'Connell approached an attorney for the defendants in an effort to obtain a settlement offer from him. This questionable overture can only be seen as an effort to enhance his position to receive a fee. No significant offer was made in response to this approach; in fact, substantial settlement negotiations did not begin until eight months following the entry of new counsel into the case.

11. The effect of the appearance of Attorneys Velis and Ziter on the course of the litigation was dramatic. They obtained the remaining insurance funds from Morisi & O'Connell and immediately released them to the plaintiffs. They promptly obtained dismissal of the criminal charges. They pressed forward with additional depositions and paper discovery. As noted, they worked closely with the accident reconstruction expert to prepare the cross-examination of the defendants' expert witness. Perhaps as a result of the effective deposition of this witness, no expert testimony was offered by the defendants at trial.

12. Trial commenced on April 1, 1991 and continued through April 5. Presentation of liability evidence through the defen-

dants' driver and the plaintiff's accident reconstruction expert was solid. By the end of trial, the issue of liability was not substantial. At the same time, the testimony of various medical witnesses and family members regarding plaintiff's brain injuries, current condition and prognosis was deeply moving. Perhaps the most striking moment in the trial was plaintiffs' very effective closing argument, during which one of the juror's was tearful and a second visibly moved. At the conclusion of this argument, just before the court was about to give its final instructions on the law to the jury, counsel announced that the case had settled for $2 million, an amount substantially higher than any previous offer of the defendants.

13. After his termination on July 12, 1990, Attorney O'Connell continued to expend time on the case. This included discussions with plaintiffs' new counsel and the hiring of a "shadow" juror by him to observe the trial and report her impressions, as a lay person, of the evidence. This court is obviously familiar with the trial and finds that these efforts had little, if any, impact on its course. Plaintiffs' evidence came in so strongly it was not necessary to have a "shadow" to know which quarter of the sky the sun was in. Despite skillful efforts by defendants' counsel, the strong liability evidence and severe brain damage suffered by James Salvini made a large award inevitable.

14. Morisi & O'Connell have claimed 273.8 hours of attorney time expended in connection with this case and 171 hours of time expended by their paralegal. The court finds the amount of attorney time claimed to be excessive, for two reasons. First, it is inappropriate for Morisi & O'Connell to make a claim for any time expended after their termination, on the facts of this case. While it is (albeit barely) conceivable that in some cases such time might be compensable, in this case the additional efforts had absolutely no impact on the settlement or outcome. Second, even after deducting the time expended after July 12, 1990, the earlier hours claimed are unreasonable and often duplicative. By comparison, the court notes that defendants' counsel reported only 57 total hours of work in this case up to July 12, 1990.

15. The court will also heavily discount the 171 hours of paralegal time claimed, both for facial excessiveness and for lack of itemization.

16. Based upon the foregoing, the court finds 110 hours to be the reasonable and fair amount of time necessary to accomplish the preliminary work done in this case by Morisi & O'Connell. It is noteworthy that this is almost double the number of hours committed to the case by defendants' counsel during the same time. In addition, the court finds reasonable a claim for 60 hours of paralegal time. Based on counsel's representations and the court's familiarity with prevailing rates in the area, the court finds an hourly rate of $120.00 per hour for attorneys with O'Connell's experience in 1989–90, and a rate of $40.00 per hour for paralegal work, to be fair and reasonable.

## III. DISCUSSION.

■ The criteria to be applied in determining the appropriate amount of fees to be awarded under a *quantum meruit* analysis were set forth by the Massachusetts Supreme Judicial Court in *Mulhern v. Roach*, 398 Mass. 18, 494 N.E.2d 1327 (1986).

> In determining what is a fair and reasonable charge to be made by an attorney for his or her services "many considerations are pertinent, including the ability and reputation of the attorney, the demand for his services by others, the amount and importance of the matter involved, the time spent, the prices usually charged for similar services by other attorneys in the same neighborhood, the amount of money or the value of the property affected by the controversy, and the result secured." *Cummings v. National Shawmut Bank*, 284 Mass. 563, 569 [188 N.E. 489] (1933). See S.J.C. Rule 3:07, DR 2–106(B), as appearing in 382 Mass. 772 (1981). See also *First Nat'l Bank v. Brink*, [372 Mass. 257] at

265 [361 N.E.2d 406] (factors listed in rule are "substantially identical" to those contained in *Cummings, supra*). Not one of the factors is necessarily decisive. "The weight to be given to each of them will vary according to the nature of the services rendered in the particular instance under examination." *McLaughlin v. Old Colony Trust Co.*, 313 Mass. 329, 335, 47 N.E.2d 276 (1943). *Id.* 398 Mass. at 24–25, 494 N.E.2d 1327.

An examination of the various factors laid out in *Mulhern* persuades the court that Morisi & O'Connell are entitled to a relatively modest fee award.

### 1. *Ability and Reputation.*

Counsel were relatively new members of the bar and brought to the trial of this case average skills and reputation. Attorney O'Connell's actions in delaying release of the file and in continuing to attempt settlement negotiations after his termination demonstrated questionable judgment.

### 2. *Demand for Services.*

Morisi & O'Connell certainly expended time on this case that could have been devoted to other fee-producing work. This factor will be considered in computing the appropriate level of fees.

### 3. *Importance and Difficulty of Matter.*

This case was extremely important to the Salvinis. James D. Salvini will need medical assistance, vocational rehabilitation and caretaking for the rest of his life. The legal and factual issues offered a moderate level of complexity. The complexity of the case, however, was not in its initial stages. The more difficult areas of trial preparation and presentation of the evidence were handled by Velis and Ziter.

### 4. *Time Spent.*

A substantial amount of time, even by this court's reckoning, was expended by Morisi & O'Connell in this matter. The court recognizes that time expended is only one factor to be considered in determining a reasonable fee. The court is not automatically to adopt a "lodestar" approach in determining a fair and reasonable fee under the attorney's lien statute. *Mulhern v. Roach*, 398 Mass. at 27, 494 N.E.2d 1327.

### 5. *Prices Charged for Similar Services in the Area.*

The court is well acquainted with the prevailing rates both for services charged by the hour and for cases taken on a contingency basis in the Springfield area since 1989. The slippery question presented in this case is whether a discharged attorney should be remunerated on an hourly basis when he expends a substantial number of hours on a case initially taken on a contingency basis.

### 6. *Amount Involved and Value of Property Affected by Controversy and Result Secured.*

The amount involved in this case is obviously substantial. On the other hand, the contributions of Morisi & O'Connell, while professional on the whole, were preliminary and largely routine. The result in this case was "secured" by the skillful handling of the pretrial phase by Velis and Ziter and particularly by the very effective presentation of evidence at trial. Morisi & O'Connell can claim little credit for securing the favorable outcome for plaintiff here. In saying this, the court does not intend to derogate the skills of Attorney O'Connell, but simply to recognize that they were applied in the very early stage of the case and on matters not demanding high levels of ability.

In reaching its conclusions, this court gives no weight to the affidavit of Robert Wisnewski, the litigation examiner for the excess carrier in this case, who had a key role in the decision to make the ultimate offer that settled the case.[3] He suggests that "the strengths of this case were galvanized by the timely efforts of Attorney O'Connell" and that "the outcome of this

---

**3.** The primary carrier, Cigna, tendered its policy limit of $1 million early in the case; Wisnewski was employed by the Chubb Group, the excess carrier.

case was substantially assisted by the early actions of Attorney O'Connell." Affidavit of Robert Wisnewski, Exhibit 4 to Memorandum of Morisi & O'Connell, at ¶ 9.

The court finds the Wisnewski Affidavit unhelpful because the reasons cited for the conclusion make no sense. Wisnewski cites three factors to support his conclusion.

First, he notes "the timeliness and strength" of the investigation by plaintiffs' reconstruction expert. However, Wisnewski was well aware of the contents of this report at a time when he was refusing to make *any* offer in the case. A substantial offer was extended only after the expert had testified at trial, after it was clear that defendant would offer no contrary expert testimony and following Attorney Velis' closing.

Second, Wisnewski notes the importance of "a written statement" of the defendant's driver obtained by Attorney O'Connell. As noted, this statement was less helpful to the plaintiffs than other, earlier statements given to law enforcement authorities and entered into evidence at trial. The investigator's statement was never offered.

Third, Wisnewski mentions the testimony of Dr. Clionski and the "day in the life" video arranged by Attorney O'Connell. Again, the "day in the life" video was never offered at trial and it is hard to see how this could have been a factor in settlement. While Dr. Clionski was originally retained by O'Connell, he was prepared for trial by Velis and Ziter.

The opinion of an insurance executive as to what caused the settlement of the case may generally be entitled to some weight, so long as it is supported by credible reasons. In this case, however, the court finds the reasons offered to be wholly inadequate to support the conclusion. In sum, while the court has carefully weighed the Wisnewski Affidavit, it will afford the statement negligible credit.[4]

The key issue in this case is the mechanism for determining the appropriate level of an attorney's fee award, on a *quantum meruit* theory, where the attorney's contributions were limited to the early stage in the litigation and, while workmanlike, did not reflect special skill and had little influence on the ultimate outcome of the case. Recognizing that the computation of reasonable hours times normal hourly rate is not the approach to be taken in any but a few cases, the court nevertheless finds this approach appropriate under the specific circumstances here. Where a higher level of skill is necessary, or where the efforts of counsel bear a more substantial relation to the ultimate favorable outcome, a share in the contingency "bonus" would obviously be the more appropriate course. Given the absence of these considerations in this case, fair compensation for Morisi & O'Connell is their reasonable hours times the normal hourly rate.

## IV. CONCLUSION AND ORDER.

For the foregoing reasons, the court hereby finds that Morisi & O'Connell are entitled to an award of fees, on a *quantum meruit* basis in the amount of $13,200 for attorney work and $2,400 for paralegal work, for a total of $15,600. The clerk is hereby ordered to release a check to the firm Morisi & O'Connell in the amount of $15,600, and to release a check for the balance to the law firm Velis & Ziter, as attorneys for the plaintiffs.

It is So Ordered.

---

4. The negotiations between plaintiff's co-counsel, Ziter, and Wisnewski, in the latter stages of trial were conducted under pressure and were often heated. The unpleasant aftertaste of these negotiations may be flavoring Wisnewski's conclusions.